IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:05-CV-0063-L** |
| | § | |
| **SCOTT B. GANN**, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC") filed this action on January 10, 2005, pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, alleging securities fraud. Specifically, the SEC alleges that Defendant Scott B. Gann ("Defendant" or "Gann") engaged in a fraudulent scheme to disguise deceptive market timing practices on behalf of a client. The court conducted a three-day bench trial from January 9, 2008 through January 11, 2008. The parties filed their proposed findings of fact and conclusions of law on February 25, 2008. Based upon a preponderance of the evidence, the court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Findings of Fact[1]

### A. Background

Gann, a resident of Parker, Texas, was a Senior Vice-President and registered representative (commonly referred to as a stockbroker) in Southwest Securities, Inc.'s ("SWS") Private Client Group from December 2001 until April 2004, when SWS terminated his employment for books-and-records violations. Joint Pretrial Order, Substantive Stipulations (Aug. 3, 2007) 1, 4 (hereinafter, "Stip. Fact"). Defendant has been involved in the brokerage business since 1992. Trial Transcript (hereinafter, "Tr.") 344:24-25. Gann maintained his physical office in the downtown Dallas branch of SWS. Stip. Fact 6. He currently works as a stockbroker at Sanders, Morris, Harris, where he manages between $50 million and $100 million in assets. Tr. 385:14-386:12. Gann has not engaged in mutual fund trading since 2003. Tr. 413:2-4.

### B. The Haidar Account

As part of his duties with SWS, Gann assisted Haidar Capital Management and Capital Advisor ("HCM") in the purchase and sale of mutual funds. Stip. Fact 5. In or around November 2002, Joseph O'Brien ("O'Brien"), a trader employed by HCM, telephoned George B. Fasciano ("Fasciano")[2], another stockbroker employed by SWS, and expressed an interest in opening accounts

---

[1]The facts contained herein are either undisputed or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Plaintiff or Defendant; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony.

[2]Fasciano was also a Defendant in this case. The SEC settled with Fasciano, and the court entered a Final Judgment as to Fasciano on April 23, 2007.

for HCM at SWS for the purpose of executing market timing trades. Tr. 46:9-23; 414:10-14. Thereafter, Fasciano sought out Gann to partner with him on the HCM business. Stip. Fact 7. At that time, Gann had never traded mutual funds and was not licensed to trade them. Tr. 345:6-10.

Market timing refers to the practice of short-term buying and selling of mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Tr. 33:2-35:4. Market timing, while not illegal *per se*, can adversely affect the mutual fund shareholders because profits that a market timer takes can dilute the value of shares held by long-term shareholders. Stip. Fact 21. In addition, the frequent in and out trading associated with market timing activity disrupts portfolio management and increases trading costs. Stip. Fact 21. Gann admits that he knew that mutual fund companies employed compliance monitors, commonly referred to as the "market timing police," whose job it was to prevent market timing trades. Tr. 184:8-16. O'Brien admits that in his first conversation with Fasciano, he told him that the mutual funds did not like HCM's market timing trading practices. Tr. 45:20-22; 47:21-23. He also testified that HCM was looking for brokers that had market timing "capacity," or who had access to accounts that had not been blocked by mutual funds. Tr. 46:17-23.

HCM represented to SWS that: it had an institutional client base; it was exempt from SEC regulatory status; it had various investment vehicles, equity funds, and fixed income funds; Said Haidar had degrees from Harvard University and the University of Chicago; O'Brien was a Yale graduate; and it had a compliance department headed by Brian Hick. Tr. 106:10-108:7, 350:22-351:9; Pl. Ex. 44. Gann testified that he was told that HCM had different investors with different investment strategies, and that no one told him HCM was a single investor or company. Tr. 250:3-13.

### 1.    Representations about Compliance

O'Brien stated that HCM told SWS that it had lawyers for compliance "[a]t least considering the OFAC list" and to determine if HCM was trading with terrorists. Tr. 108:16-109:8; Pl. Ex. 46.[3] Gann testified that HCM told him that it had its own compliance department, and that it had legal counsel that had done due diligence and approved the market timing business. Tr. 348:19-349:4; 350:22-351:9. Fasciano testified that SWS's compliance officer and its lawyers also did checks before the HCM business was approved. Tr. 419:6-420:6. Gann states that HCM represented that other brokerage firms had run its business through their compliance departments and done business with it. Tr. 349:5-15. O'Brien, who made many of the representations on behalf of HCM, testified that Said Haidar told him he had spoken with legal counsel and the law firm of KMZ Rosenman, who confirmed that market timing was legal. Tr. 86:10-18. O'Brien did not believe he was asking Gann and Fasciano to do anything illegal or fraudulent. Tr. 94:17-95:6. Although O'Brien later had reservations about what Said Haidar was doing, he never expressed these reservations to Gann. Tr. 86:1-6.

Specifically as to the market timing business, O'Brien told Gann and Fasciano that HCM had a tracking system that it would use to track trades and ensure compliance. Tr. 101:17-102:1. Gann was told by Said Haidar that HCM had never been shut down and remained in good standing with the brokers with whom it did business. Tr. 352:2-20.

### 2.    Due Diligence on HCM

Gann did in fact enter into a series of transactions in numerous funds to try to take advantage of the inefficiencies in the market place and or price discrepancies of certain funds. Stip. Fact 5.

---

[3]OFAC refers to the United States Department of the Treasury Office of Foreign Assets Control.

Before these transactions took place, Gann spent approximately five or six months engaging in due diligence, including checking the OFAC list and meeting with HCM representatives in New York. Tr. 346:6-25. He also questioned HCM about its track record and litigation. Tr. 347:21-348:6. Other SWS employees, including Carrie Austin and SWS's head of compliance, Phyllis Knowles ("Knowles"), had teleconferences with individuals at HCM. Tr. 354:22-23. Defendant also met with the CEO of SWS because he needed an additional license to engage in the HCM business. Tr. 354:22-355:4. Gann testified that Knowles advised him that he could not engage in the business without her approval, which she eventually gave. Tr. 355:17-21.

O'Brien testified that Gann "proceeded carefully" before beginning business with HCM. Tr. 95:15-96:1. SWS took longer than any other brokerage firm HCM had worked with before beginning business, and "showed quite a bit more care than any other firm that we had encountered." Tr. 96:13-16; 97:18-19.

In November 2002, HCM responded to a written questionnaire from Gann and Fasciano. Stip. Fact 8. The questionnaire asked: "[w]hat strategies have you enacted to avoid being shut down [by the mutual funds] in the future?" HCM responded: "Having more than one number with a [registered representative]. Rotating accounts and more than one [registered representative] number with multiple accounts." Stip. Facts 9-10; Pl. Ex. 41. During phone calls with HCM, Gann and Fasciano learned that HCM was engaging in tactics designed to circumvent the mutual funds' rules that prohibited market timing. Tr. 181:10-15. The written questionnaire was received by Gann and Fasciano. Tr. 181:24-182:2; 449:3-14. The issues raised in the questionnaire were also discussed on a phone call with Gann, Fasciano, and Said Haidar. Tr. 181:10-15. Gann's handwritten notes also reflect HCM's market timing strategy. Tr. 185:2-188:10; Pl. Ex. 124. These notes reflect that

"compliance at funds trying to stop this timing business" and that solutions included "accounts with the same entity" with "different financial advisor number[s]." Pl. Ex. 124 (SEC TR 1535).

### 3. Due Diligence on Market Timing

Gann testified that he was concerned that HCM's trades might not be compliant with the mutual fund rules and prospectuses. Tr. 352:21-353:5. Gann and Fasciano were aware that mutual fund companies scrutinized trades in excess of certain dollar amounts. Stip. Fact 19. Gann testified that he and Fasciano engaged in a fact-finding mission with regard to the mutual fund companies they considered trading with on behalf of HCM. Tr. 356:15-357:6. Because each mutual fund had its own rules and prospectuses, Defendant and Fasciano called various contacts at the mutual fund companies and asked them about the business they wanted to do, and whether they could provide any guidance. Tr. 356:15-357:6. Gann states that if a company told him or Fasciano that they were not interested in mutual fund trading, the company was struck from the list. Tr. 358:5-9. Fasciano concurred, and testified that he and Gann split up the mutual fund alphabet, contacted each fund, and determined what each fund's rules were to ensure that their trades were compliant. Tr. 422:13-23. Kevin Marsh ("Marsh"), another SWS stockbroker and long-time friend of Defendant's, testified that he saw Gann conducting due diligence by contacting the mutual funds and writing things in his notebook. Tr. 512:15-513:7. Gann states that he sent copies of all the mutual fund companies' rules to O'Brien before any trading began. Tr. 362:24-363:20.

In November or December 2002, Jason Burks ("Burks"), a stockbroker at SWS, told Gann and Fasciano that executing market timing trades required the broker to engage in strategies designed to enable the broker's trades to fly "under the radar" and "not bring attention to yourself with the fund families." Tr. 150:10-152:11; 157:12-15. These strategies include using multiple

account numbers and representative numbers. Tr. 150:15-151:2. Burks explained to Gann and Fasciano that the purpose of using these strategies was "to circumvent block notices and get transactions executed in mutual funds that imposed trading restrictions on market timers." Tr. 152:12-17.

According to Gann, after all of this due diligence, SWS instituted a procedure to execute HCM orders. Tr. 358:25-359:6; Pl. Ex. 29. The written procedure states that three LLCs are to be used for HCM orders; that "all trades will be recorded and compared to each individual mutual fund['s] trading rules that can be found in [their] prospectus;" that upon receiving an order, SWS is to check the order against the mutual fund ledgers and make warning phone calls to the mutual funds if necessary; and "SWS Securities reserves the [right] to deny any trade and relin[q]uishes all responsibility if the fund companies reject the trade." Pl. Ex. 29. O'Brien testified that Gann was concerned with ensuring that both SWS and HCM were compliant with the mutual funds' rules. Tr. 100:3-7.

O'Brien believed that SWS intended to have one employee man a trading desk for its HCM trades and communicate with the mutual funds and ensure compliance. Tr. 103:11-18. Daniel Leland, the President and CEO of SWS, also testified that SWS intended to centralize HCM's trades in a mutual fund trading desk beginning in February 2003. Tr. 323:2-7. Fasciano testified the SWS wanted Fred Turner ("Turner") to maintain relationships with the mutual fund companies, rather than him and Defendant. Tr. 432:16-24. Gann testified that this centralized system was set up before any trades were made. Tr. 367:3-11. To support Turner's centralized desk, Gann and Fasciano's commissions were reduced in order to ensure that the HCM trades were compliant. Tr.

367:12-19.  O'Brien told Gann and Fasciano that HCM also had a tracking system to ensure that its trades were compliant.  Tr. 101:22-102:1.

A draft of the HCM procedures shows that all trades were to be given to Turner.  He was expected to understand the trading rules of the fund, to enter all orders, and to create and maintain relationships with the funds.  Def. Ex. 4.  Fasciano testified that it was up to Turner to contact the mutual funds to determine if a given trade was compliant.  Tr. 426:5-10.  Marsh stated that Turner was to call a mutual fund before a trade was made and get approval for it.  Tr. 521:17-22.  Pursuant to this system, each trade should have been compared to the mutual fund's rules, focusing on the money permitted per trade and the amount of transactions permitted per year.  Tr. 360:21-361:5. The draft procedures also state that both Turner and the "rep" "need to be sure [the order] does not violate selling agreement.  Rep should tell [Turner] if it does or does not and [Turner] should verify."  Def. Ex. 4.  Fasciano testified that this centralized procedure and Turner's role in processing trades prevented him and Gann from keeping track of HCM's trades.  Tr. 425:20-426:4.

O'Brien testified that he believes that Gann and Fasciano "at the very, very beginning," believed that they could engage in market timing and be compliant.  Tr. 105:9-16.  Before any trades were made, Gann sent a sample of mutual fund rules to HCM in an attempt to ensure that he and HCM were compliant.  Tr. 109:9-110:2.  Fasciano e-mailed O'Brien on February 24, 2003 attaching a template to keep track of trades.  Tr. 111:11-112:7; Pl. Ex. 61.

### C.      SWS Trades on Behalf of HCM

Beginning in January 2003, SWS and HCM entered into "fee-based" account agreements, whereby SWS charged HCM a 1.5% fee on total assets under management.  Stip. Fact 11.  Gann and Fasciano shared equally the fees generated by the HCM accounts.  Stip. Fact 12.  Gann and Fasciano

began opening accounts in January 2003, and HCM placed its first trade on or around February 10, 2003. Stip. Fact 13. On January 23, 2003, Gann and Fasciano opened five accounts for five different HCM-related affiliates. Stip. Fact 14. By May 6, 2003, they had opened 21 HCM accounts for nine different HCM affiliates. Stip. Fact 15; Pl. Ex. 127. Fasciano testified that multiple accounts were used to prevent trading from being "shut down." Tr. 458:3-15. In making trades on behalf of HCM, Gann made wire transfers that were sent via facsimile. Pl. Exs. 107, 110.

Gann knew that these accounts had the same investors. O'Brien told Gann and Fasciano that the HCM affiliates were related. Tr. 66:5-67:22; 132:3-18. HCM routinely transferred money between the accounts. Tr. 67:23-70:4. Gann and Fasciano would have had to determine that the accounts had common ownership before transferring money between the accounts. Tr. 284:18-289:1. Many of the accounts had common tax identification numbers. Pl. Ex. 127. O'Brien gave Gann and Fasciano the operating agreements for the HCM affiliates, which further clarified that they were funds owned by HCM. Tr. 61:18-22.

Gann and Fasciano used three registered representative numbers to make trades for HCM. Stip. Fact 16. They each had their own registered representative number and a joint number, which is customary in the industry when a broker partnership exists. Stip. Fact 16. Gann's registered representative number was listed on nine accounts; Fasciano's was listed on nine; and the joint number was listed on three accounts. Stip. Fact. 17; Pl. Ex. 127. Leland and Laura Leventhal, the controller of SWS, testified that there is no legitimate business or accounting purpose for the use of multiple registered representative numbers. Tr. 283:14-284:1; 232:3-7. The use of multiple representative numbers made SWS's internal accounting more difficult. Tr. 230:20-231:5. O'Brien

described the use of multiple representative numbers as "designed to basically hide the identify of the investor to be able to continue to trade." Tr. 81:2-6.

Gann testified that the SWS procedure for HCM trades was followed. Each day, he would receive a fax from HCM around 1:30 or 2:00 p.m with instructions to buy, exchange, or sell. Tr. 365:14-22. Gann stated that he would immediately fax a copy to Turner. Tr. 365:24-366:3. Gann testified that the faxes were sent quickly to Turner so that he could verify if the trade complied with that mutual fund's prospectus. Tr. 366:4-9.

### D. Block Notices

Gann and Fasciano placed the first market timing trade on behalf of HCM on February 10, 2003. Pl. Ex. 36. They received their first block notice fifteen days later, on February 25, 2003, from SEI Funds. Pl. Ex. 30 (SEC TR 0733). The term "block notice" refers to a communication from a mutual fund company prohibiting market timing trading. Tr. 39:15-20; Pl. Exs. 12, 19, 30. Block notices typically include a statement of a mutual fund's objection to market timing and a notification of restrictions on market timing trading, including the prohibition of future trades in specific blocked accounts, of trades by a particular broker, or of future trades bearing a particular branch office identification number.

Gann stipulated that he and Fasciano were aware of the block notices. Stip. Fact 18. Both he and Fasciano, however, testified that they were not always aware that a block notice had been received because Turner did not tell them. Tr. 376:4-14; 426:20-427:2. Marsh testified that when block notices were received, it was the responsibility of Turner and Scott DeRouen ("DeRouen") to find out why the notice had been received and to determine if trading could continue in a different

manner. Tr. 518:4-15. Gann and Fasciano were angry when they began receiving block notices. Tr. 371:4-6.

After they began to receive block notices, Gann and Fasciano began using a new office identification number in processing trades for HCM, though they physically remained at the downtown Dallas headquarters of SWS. Stip. Fact 20. Fasciano testified that this different branch number was used to dissociate themselves from Burks. Tr. 427:3-10. He stated that this was not used to deceive or disguise the mutual fund companies. Tr. 427:11-13. O'Brien also testified that he understood that a different branch number was used to avoid being associated with Burks, who had also engaged in market timing. Tr. 120:8-17.

According to Fasciano, no block notices should have been received if Turner were doing his job. Tr. 430:13-16. Fasciano testified that Turner was overwhelmed by his job and sometimes refused to speak to him or Defendant. Tr. 430:22-431:5. Fasciano tried to complain about Turner to Tony Morrow ("Morrow"), the head of SWS's mutual fund department, but Morrow refused to speak to him. Tr. 431:6-10. Gann also testified that he became concerned that Turner was not doing his job properly. Tr. 372:24-373:10.

On some occasions, Turner would tell Gann and Fasciano that pursuant to instructions from the mutual fund companies, they should stop trading in certain accounts or using certain representative account numbers. Tr. 378:4-16. In some instances, Turner would tell Gann and Fasciano that they could continue trading in a fund even after receiving a block notice. Tr. 379:4-19. There is some evidence that Gann and Fasciano contacted mutual fund companies regarding their plans to engage in market timing trades and in an attempt to comply with the companies' rules. Pl. Exs. 72-74, 77.

Gann and Fasciano continued to execute trades in mutual funds after those funds had issued block notices to them. Several witnesses testified that this in and of itself demonstrates that they did not intend to comply with the mutual funds' rules and prospectuses. Tr. 125:18-126:7; 330:2-6. Leland testified that Gann and Fasciano violated SWS's procedure if they traded in funds from which they had received block notices and that a block notice was the "final word." Tr. 327:1-4; 329:18-330:1. Moreover, DeRouen testified that it was not his responsibility to inform the mutual funds that HCM was a market timer. Tr. 484:4-8; 491:8-24.

While there is evidence that SWS set up procedures to ensure compliance, Fasciano never saw any written procedures for handling market timing trades. Tr.425:9-11. Leland testified that he did not know if the procedures were ever actually implemented. Tr. 328:24-329:17. During the period that Gann and Fasciano were making trades for HCM in 2003, both questioned the efficacy of the SWS procedures and whether Turner was adequately performing his job. Tr. 372:24-373:1, 379:7-14; 439:17-440:7. There is no evidence in the record that a single mutual fund family gave Gann permission to continue trading in their funds after sending SWS a block notice. Tr. 396:10-16.

### E. Specific Mutual Fund Families

#### 1. Goldman Sachs

In 2003, Goldman Sachs did not permit any market timing in its family of funds and had a zero-tolerance policy for market timing. Pl. Exs. 9, 12, 86. Between April 8 and 14, 2003, Fasciano, using registered representative number D013, executed three trades in Goldman Sachs funds on behalf of an HCM affiliate, Wessex Capital. Pl. Ex. 132 (SEC TR 1664). On April 21, 2003, SWS received a block notice from Goldman Sachs, barring trades from account number 801015393 and Fasciano's registered representative number. Pl. Ex. 12. After receiving the block notice, Gann and

Fasciano placed five additional trades in Goldman Sachs funds, using different HCM account numbers and Gann's registered representative number. Tr. 271:11-19. Goldman Sachs sent additional block notices to SWS on June 13, 2003, and July 9, 2003. Pl. Ex. 86. After these block notices were received, Gann and Fasciano continued to trade in Goldman Sachs funds. Pl. Ex. 132 (SEC 1661-63). Gann and Fasciano admit that no one at Goldman Sachs authorized them to execute market timing trades in its funds. Tr. 178:18-179:3; 466:10-14.

### 2. AIM Funds

AIM Funds determined that market timing is harmful to long-term investors and does not allow it in its family of funds. Cohen Dep. 13:5-7; 16:8-17:22. The AIM Funds prospectuses state that it has the right to reject trades at any time if it determined that the trade was harmful to its investors. Cohen Dep. 12:5-22; Pl. Ex. 7. In processing orders, AIM Funds received an account number, not the client's name. Cohen Dep. 20:18-22:17.

Between April 2, 2003 and June 4, 2003, Gann, using registered representative number C276, executed twenty-seven trades in AIM Funds on behalf of an HCM affiliate, FCK Partners, in account 277316943. Pl. Ex. 132 (SEC 1653). On June 6, 2003, SWS received a block notice for AIM Funds, barring future trades in account 277316943. Pl. Ex. 8. Between June 19, 2003 and September 8, 2003, using different registered representative numbers and account numbers, Gann and Fasciano executed an additional twelve trades in AIM Funds. Pl. Ex. 132 (SEC 1653). Between March 13, 2003 and July 25, 2003, Gann executed forty-one trades using account 339542560, an account in the name of HCM affiliate Haidar Jupiter Short Equity. Pl. Ex. 132 (SEC 1654). On July 28, 2003, SWS received a block notice from AIM Funds barring future trades using account 339542560. Pl. Ex. 8. Subsequently, Gann and Fasciano executed eighteen additional trades in

AIM Funds, using different registered representative numbers and account numbers. Pl. Ex. 132 (SEC 1654). No one at AIM Funds authorized Gann and Fasciano to execute market timing trades in its funds. Cohen Dep. 18:12-15.

### 3. Hartford Funds

Hartford Funds determined that market timing disrupted management of its funds and increased transaction costs for all shareholders and prohibited market timing. Sommers Dep. 20:22-21:10; Pl. Ex. 19. Hartford Funds limited trades in its funds and reserved the right to reject any trades it deemed harmful to its investors. Pl. Ex. 18 (SEC 0492).

Between February 25, 2003 and April 7, 2003, Gann, using registered representative number C276, executed twenty-three trades in Hartford Funds on behalf of three HCM-affiliated accounts, FCK Partners, Wessex Capital, and Devon Capital. Pl. Ex. 132 (SEC 1668). On April 15, 2003, SWS received a block notice from Hartford Funds, barring future trades from Gann's registered representative number, C276. Pl. Ex. 19. Thereafter, Gann and Fasciano executed forty-three additional trades in Hartford Funds, using seven different accounts and different registered representative numbers. Tr. 263:24-264:17.

### 4. Harbor Funds

In 2003, Harbor Funds had a zero-tolerance policy on market timing. Haag Dep. 10:3-5; Pl. Ex. 1 (SEC 0060). Between June 11, 2003 and June 19, 2003, Gann executed nine trades in Harbor Funds using account 801024335 on behalf of HCM-affiliate Wessex Capital. Tr. 269:6-12; Pl. Ex. 132 (SEC 1665). On June 20, 2003, SWS received a block notice from Harbor Funds barring future trades on behalf of account 801024335. Pl. Ex. 3. After the block notice was received, Gann and Fasciano executed thirteen additional trades in Harbor Funds, using two different account

numbers. Haag Dep. 41:21-42:6, Tr. 269:19-23; Pl. Ex. 132. Harbor Funds did not make any exception for Gann's market timing trades or otherwise authorize him to execute market timing trades in its funds. Haag Dep. 41:11-17; 101:11-20.

### 5.     CDC Nvest Funds

CDC Nvest deemed market timing harmful to long-term shareholders and reserved the right to reject market timers' trades. Loureiro Dep. 13:16-17:4; Pl. Ex. 15 (SEC 0323). Between March 12, 2003 and April 7, 2003, Gann executed twenty-two trades in CDC Nvest funds using his registered representative number, C276, and on behalf of two HCM-affiliate accounts, Wessex Capital and Devon Capital. Tr. 265:4-9; Pl. Ex. 132 (SEC 1657-59). On April 8, 2003, CDC Nvest sent a block notice to SWS blocking Gann's registered representative number from making future trades. Pl. Ex. 17. After receiving this notice, Gann and Fasciano executed an additional thirteen trades using Fasciano's registered representative number and using different HCM account numbers. Tr. 266:8-267:6; Pl. Ex. 132 (SEC 1657-59).

### 6.     ING Funds

Pursuant to its prospectus, ING may restrict or refuse purchase orders by market timers. Pl. Ex. 30 (SEC 0713). Between February 25, 2003 and April 14, 2003, Gann executed twenty-five trades in ING funds using his registered representative number on behalf of five HCM affiliates. Pl. Ex. 132 (SEC 1675-76). On April 16, 2003, ING sent a block notice to Gann barring future trades on behalf of his clients. Ex. 30 (SEC 0713). Subsequently, Gann and Fasciano executed thirteen additional trades on behalf of HCM accounts in ING funds. Pl. Ex. 132 (SEC 1675-76).

### F. Conclusion of HCM Trading

By September 2003, Gann and Fasciano had executed approximately 2,500 trades on behalf of HCM in fifty-six mutual fund families, and in 165 mutual funds, with an aggregate value of $650 million. Tr. 284:5-11; Pl. Exs. 36, 127. Of the 2,500 trades executed on behalf of HCM, there were sixty-nine block notices sent from thirty-four mutual fund families. Tr. 324:7-18; Pl. Ex. 30. None of these trades disguised Gann's name. Tr. 103:19-104:13. Gann and Fasciano used multiple registered representative numbers to trade in funds that had previously blocked their other registered representative numbers. Tr. 129:22-130:1; 460:7-10. Defendant Gann was paid $56,640.67 in pre-tax commissions for his work on the HCM account. Tr. 231:13-232:2. He was not paid per trade, but rather on the amount of money managed. Tr. 234:21-25.

## II. Conclusions of Law[4]

The court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act. 15 U.S.C. §§ 78u, 78aa; 28 U.S.C. § 1331. Venue is proper in the Northern District of Texas because Gann resides in the Northern District, and most, if not all, of the acts and transactions alleged in the Complaint occurred within the district. 28 U.S.C. § 1391.

This action is governed by Section 10(b) of the Exchange Act and Rule 10b-5. In pertinent part, Section 10(b) of the Exchange Act, as amended, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
>
> * * *

---

[4]To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j)(b) (1934) (amended 2000). Pursuant to its Section 10(b) rulemaking authority, the SEC has adopted Rule 10b-5 which, in relevant part, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1996). Gann directly or indirectly made use of the mails or instruments of transportation or communication in interstate commerce by making wire transfers that were sent via facsimile.

To establish a violation of Section 10(b) and Rule 10b-5, the SEC must show that Gann: "(1) used a fraudulent device, made a material misrepresentation or omission, or committed an act that operated as a fraud or deceit; (2) in connection with the purchase or sale of securities; and (3) acting

with scienter." *SEC v. Hopper*, 2006 WL 778640, *9 n.15 (S.D. Tex. Mar. 24, 2006) (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 463-64 (S.D.N.Y. 2004)). Other circuits have recognized that the SEC, unlike private litigants, need not prove the elements of reliance, proximate causation, or harm in a Section 10(b) claim. *Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003) (citing cases); *see also Hopper*, 2006 WL 778640 at *9 n.15.

The SEC must establish that Defendant Gann acted with scienter, or the "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)). Strict intentional misconduct is not necessary; it is sufficient to prove that the conduct in question is an "extreme departure from the ordinary standards of care." *Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 1997).

The antifraud provisions of the securities laws have been characterized by the Supreme Court as "catch-all provisions," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-03 (1976), that are "designed to prevent fraudulent practices." *Chiarella v. United States*, 445 U.S. 222, 226 (1980). *See also Superintendent of Ins. of State of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12 (1971) ("Since practices constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers in the regulatory agency have been found practically essential. . . . Section 10(b) must be read flexibly, not technically and restrictively.") (internal quotations and citations omitted). While market timing is not *per se* illegal, other courts and the SEC have found violations of the securities antifraud provisions by actions

similar to those taken by Gann. *See SEC v. Druffner*, 517 F. Supp. 2d 502 (D. Mass 2007); *In re Trautman Wasserman & Co., Inc.*, SEC Action File No. 3-12559, 2008 SEC LEXIS 327 (Feb. 14, 2008).

The court first determines that Gann made material misrepresentations. "[T]he test of materiality is whether a reasonable man would attach importance to the fact misrepresented in determining his course of action." *Wheat v. Hall*, 535 F.2d 874, 876 (5th Cir. 1976) (internal citation and quotation omitted). Given the policies of the mutual funds prohibiting market timing, their active policing of market timers, and the block notices that were sent when their rules were violated, the court determines that the mutual funds would have attached importance to Gann's use of multiple accounts and representative numbers, as well as the change in the branch office identifier, in light of the fact that Gann continued to trade in their funds after receiving block notices. Gann tried to make it appear as if different brokers and clients were making trades when he and Fasciano continued to try to make market timing trades on behalf of HCM after block notices were received. Accordingly, Gann's actions were material misrepresentations made in the course of buying securities.

Gann and Fasciano both testified that they never had any intent to deceive or defraud the mutual funds. The overwhelming testimony and evidence, however, undercut Gann's credibility. His repeated conduct does not square with his testimony that he had no intent to deceive or defraud. While procedures were initially set up to ensure compliance, they began to unravel as soon as trading began, and Gann's continuing behavior in trying to make trades in funds after receiving block notices indicates his intent to deceive the mutual funds. As to Fasciano's testimony, the court notes that he agreed to a judgment that found he had violated Section 10(b) and Rule 10b-5 and a

permanent injunction. He and Gann worked closely together on the HCM account, and his testimony necessarily must be viewed with some skepticism.

The court determines that Gann acted with scienter, that is, he had the intent to deceive or defraud the mutual funds with which he traded on behalf of HCM. While the evidence does establish that at the outset of SWS's dealings with HCM, it attempted to ensure compliance with the mutual funds' rules and policies, as time went on, Gann knew that SWS's policies were not being followed, and he continued to trade in mutual fund families after his representative number or his client's account numbers had been blocked. Gann knew that HCM was a market timer and that the mutual funds were acting to prevent market timing in their funds. While he and Fasciano may have contacted the mutual funds *before* any trades were made, *after* trading began, they adopted an entirely new branch number to continue trading after their trades were blocked.

The evidence establishes that with respect to Goldman Sachs, AIM Funds, Hartford Funds, Harbor Funds, CDC Nvest, and ING, Gann responded to block notices by changing the representative number or account number and by continuing to execute trades to circumvent the mutual funds' attempts to prohibit his trades. As in *Druffner*, the court determines that Gann's actions were "intentionally geared toward evading detection by the mutual fund managers." 517 F. Supp. 2d at 509-11. Accordingly, the court determines that the SEC has shown, by a preponderance of the evidence, that Defendant Scott Gann violated Section 10(b) and Rule 10b-5.

Given Gann's repeated fraudulent actions aimed at deceiving the mutual funds, the court determines that injunctive relief is appropriate pursuant to section 21(d). 15 U.S.C. § 78u(d). In determining whether injunctive relief is appropriate, the court should consider factors including: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the

degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir.), *cert. denied*, 454 U.S. 1124 (1981). The court considers the repeated nature of Gann's misrepresentations, the number of mutual funds to which he made such misrepresentations, Gann's continued refusal to recognize that his actions involved deception, and that he continues to act as a stockbroker. Taking these factors together, the court determines that injunctive relief to prevent future violations is warranted.

The court next considers whether disgorgement is an appropriate remedy. "The purpose of disgorgement is not to compensate the victims of the fraud, but to deprive the wrongdoer of his ill-gotten gain." *SEC v. AMX, Int'l., Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)). A disgorgement remedy is therefore "remedial and not punitive" and cannot extend beyond the profit from wrongdoing. *Blatt*, 583 F.2d at 1335. The evidence establishes that Gann was paid commissions of $56,640.67 for the work he performed on behalf of HCM. The court determines that disgorgement of this amount is warranted given that Gann knew from the start that HCM looked to him to execute market timing trades, and that while SWS received only a small percentage of block notices in terms of the total trades executed on behalf of HCM, Gann continually manipulated the mutual fund companies by shifting account and representative numbers in order to continue trading. The decision whether to award prejudgment interest lies within the discretion of the trial court. *Cyrak v. Lemon*, 919 F.2d 320, 326 n.12 (5th Cir. 1990) ("[T]he standard for awarding prejudgment interest in a 10b-5 case is one of fairness and its application rests within the district court's sound discretion."). The court determines that prejudgment interest is appropriate.

Finally, the court considers whether Gann should be required to pay a third-tier civil penalty of $120,000 pursuant to Section 21(d)(3)(B)(iii). "Civil penalties are meant to punish the individual wrongdoer as well as deter him and others from future securities law violations." *SEC v. Seghers*, 2006 WL 2661138, *5 (N.D. Tex. Sept. 14, 2006) (citing *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998)). The SEC seeks a penalty of $120,000, the maximum third-tier penalty available. The court declines to impose the amount requested by the government, but determines that a civil penalty of $50,000 is adequate and consistent with the evidence adduced at trial and with the purpose of the statute.

## III. Conclusion

For the reasons stated herein, the courts finds that Plaintiff has proved by a preponderance of the evidence that Gann's actions violated Section 10(b) and Rule 10b-5, and that injunctive relief, disgorgement, and a civil penalty are appropriate. Plaintiff shall submit a proposed judgment and permanent injunction by **April 7, 2008** at **5:00 p.m.** Once the court receives the proposed judgment, it will issue a final judgment and permanent injunction in accordance with applicable law.

**It is so ordered** this 31st day of March, 2008.

Sam A. Lindsay
United States District Judge